## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION FILE** |
| | : | **NO. 1:12-CR-00285-WSD-AJB** |
| **JOSHUA THOMAS HILL [#1], and** | : | |
| **FABIAN TERRAN MURRAY [#2],** | : | |
| | : | |
| **Defendants.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Before the Court are Joshua Thomas Hill's motions to suppress evidence, [Docs. 46, 71, and 96], and to sever Count 4, [Doc. 48], and Fabian Terran Murray's motion to suppress evidence, [Doc. 80].[1]  For the following reasons, the undersigned **RECOMMENDS** that each motion be **DENIED**.

### I.    Introduction

By way of a superseding indictment, Hill, Murray and another person are charged with conspiring to commit sex trafficking of minors (Count One), and the substantive offenses of sex trafficking of minors (Counts Two and Three); and Hill is charged with

---

[1]      At the evidentiary hearing, Defendant Murray withdrew his motion to suppress identification, [Doc. 81].  [*See* Doc. 99 at 10].  As a result, the undersigned **RECOMMENDS** that the motion to suppress identification, [Doc. 81], be **DENIED AS WITHDRAWN**.

possession of a firearm by a convicted felon. [Doc. 52]. Hill and Murray seek to suppress the results of the search of room 314 at the Extended Stay America in Marietta, Georgia, that was conducted on February 22, 2012. [Docs. 46, 71, 80 and 96]. Hill also seeks to sever the firearm count from the other counts in which he is charged. [Doc. 48].

II.    *Search of Room 314, Extended Stay of America, Marietta, Georgia*

    A.    *Facts*

The Court held evidentiary hearings on Hill and Murray's suppression motions. [Doc. 99 (hereinafter "1T__"), Doc. 112 (hereinafter "2T__")]. The Court finds the following facts from the testimony and exhibits:

On February 22, 2012, at around 1:00 p.m., uniformed Cobb County Police Officers Harder and Mangold responded to a report of the smell of marijuana smoke on the third floor, specifically rooms 314, 319, or 340, of the Extended Stay America in Marietta, Georgia. 1T94-95, 116. After speaking with the manager, the officers took the elevator to the third floor, where upon exiting into the hallway, they smelled burnt marijuana. 1T95. During one of their passes by the rooms in order to pinpoint the room from which the smell emanated, a girl who appeared to be younger than fifteen

2

years old, later identified as OM, came out of room 314.  1T95.[2]  Harder had heard a

woman's voice in that room when he first went by the door.  1T95, 120.  Harder asked

her for her name and date of birth, and she stated her name was Shay Obrono and the

birth date she gave did not match what Harder believed to be her age.  1T95.  Another

young-looking girl, later identified as AC, also came out of the room, and she gave her

name as Thiana Obrono.  Upon questioning, they stated they went to school in Marietta,

but Thiana stated she currently was suspended.  Harder asked for and obtained parental

phone numbers from the girls, but upon dialing these numbers, they came back either

out of service or went straight to voice mail.  1T96.  Harder concluded the girls were

being deceptive.  1T124.  Harder asked to hold a cell phone that Shay was holding,

because it was ringing and receiving text messages and was interfering with his

questioning.  1T97; 2T30, 33, 58.[3]  After additional questioning, the girls gave Harder

---

[2]     Room 314 was registered to Defendant Hill from February 20-23, 2012.
2T7; Deft. Ex. Hill 3.

[3]     The cell phone ultimately was searched by warrant.  Hill originally moved
to suppress the fruits of that search along with the items seized from the motel room.
At the evidentiary hearing, Hill was given an opportunity to advise the Court if an
evidentiary hearing was required on the search of the phone.  1T12; *see also* 2T18-19
(government challenge to Hill's standing to contest seizure and search of the cell
phone).  No request for an evidentiary hearing was made, nor did Hill raise the seizure
and search of the cell phone in any post-evidentiary brief.  Therefore, the Court does
not address the seizure and search of the cell phone.  To the extent that Hill challenges

3

AO 72A
(Rev.8/8
2)

their real names.  1T99.  A records check showed that AC was wanted on a Douglasville warrant for misdemeanor shoplifting and that OM had been reported as a runaway.  *Id.*  Both girls were taken downstairs and placed in the back seat of Harder's patrol car.  1T100.  Since AC had a warrant against her, she was handcuffed; OM was not.  1T128.  Another officer arrived on the scene and stayed with the girls while Harder conducted further investigation.  1T130.

――――――――――――

the cell phone seizure and search, the Court **RECOMMENDED** at the evidentiary hearing that the challenge be **DENIED** because Hill did not establish standing to challenge the seizure.  2T71.

Nothing in the record alters that conclusion.  To challenge a seizure as violating the Fourth Amendment, a defendant must have "standing," *i.e.*, a legitimate expectation of privacy in the premises.  *See United States v. Gonzalez*, 940 F.2d 1413, 1420 n.8 (11th Cir. 1991).  As a result, the Fourth Amendment protects an individual in those places where he can demonstrate a reasonable expectation of privacy against government intrusion.  *See Katz v. United States*, 389 U.S. 347, 353 (1967).  Fourth Amendment rights are personal, and only individuals who actually enjoy the reasonable expectation of privacy may challenge the validity of a government search.  *Rakas v. Illinois*, 439 U.S. 128, 133-34, 143 (1978); *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000).  One's standing to challenge governmental actions on Fourth Amendment grounds is a threshold question.  *United States v. McBean*, 861 F.2d 1570, 1573 (11th Cir. 1988).  To have standing, the defendant bears the burden of showing a legitimate expectation of privacy in the area searched.  *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008); *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997).  Since Hill did not establish a legitimate expectation of privacy in the cell phone, the motion to suppress as to the seizure of the cell phone and any subsequent search of the cell phone is due to be denied.

4

Harder again spoke with the manager, who told Harder that the room was rented to Joshua Hill and that other employees had reported that Hill and two other males had been seen walking on the third floor. 1T100. The manager also stated that the two girls had come to the front desk on February 21 to make a payment for a room, but could not state the room number. 1T100. Harder called the Crimes Against Children Unit, and Detective Drew, a detective in that unit, told Harder to get more information about the girls. 1T101.

Harder then spoke to AC, who stated to him that he needed to "get the really bad people," at which point Harder put his cell phone on speaker so that Drew could hear the conversation. AC reported that she and OM had run away from a juvenile group home, Another Chance, were picked up by a male at Fair Oaks Park, and that they were "tricking" (prostituting). 1T38,102-03, 131. Drew stated he would send detectives to the motel, and Harder directed Mangold to stand guard outside room 314, which to the officers' knowledge had been unattended for almost thirty minutes. 1T102-03. The girls appeared very chatty and upset, with AC stating that people were watching them, while OM was stating that "we shouldn't do this, we shouldn't do this." 1T104. Harder backed up his vehicle containing the girls and parked it in a location where it could not be easily seen from the motel. 1T105, 1T133.

Cobb County Police Detectives Largent and Northop of the Crimes Against Children Unit were on another call when they were directed by their sergeant at around 3:00 p.m. to proceed to the motel to investigate. 1T105. Upon their arrival, Harder gave the cell phone he took from OM to Largent. *Id.* After being briefed by Harder, Largent spoke to the girls inside Harder's police car. 2T24. They were both crying and stated they were afraid because the males they were with were still in the area. 2T25. They both stated they were fourteen years old. In response to the questions Largent posed in anticipation of getting a search warrant for the room, the girls both stated that sexual activity had occurred in the motel room, condoms were used, and the linens had not been changed by the motel staff by the time of the girls' encounter with Harder. 2T25-26. When Largent asked if there was anything else in the room she needed to know about, the girls both stated there was a pistol hidden behind the microwave. 2T26.

Sergeant Brown (also of the Crimes Against Children Unit) and Drew arrived on the scene, 1T50, and discussed with Largent the items they needed to articulate in support of a search-warrant application. 2T28. They also discussed that they did not know if anyone was still in the room, particularly since there had been a time when the room was unsecured. 1T53, 2T30.

6

Approximately one-and-one-half to two hours had elapsed since Harder's first encounter with AC and OM. 1T116. Some of the officers went to check the room. Largent told Drew as they were ascending in the elevator to the third floor that the girls reported there was a pistol in the room. 1T53. The uniformed officers entered and cleared the room for the detectives, to make sure no one was hidden inside. 1T107. No one was located in the room. The detectives followed the uniformed officers inside the room. 1T113. As they were leaving, Northop looked and saw that there was a pistol hidden behind the microwave. 2T30.

Largent took the girls to the Crime Against Children Unit to interview them, and briefed Detective Loiselle, who was tasked with preparing the search-warrant application. 1T35. Meanwhile, after he had been inside the room, Drew telephoned Loiselle from the motel and told her about the investigation so that Loiselle could include those findings in the application for a search warrant. 1T53, 1T55. The application, sworn to by Loiselle at 5:51 p.m., provided as follows:

> On 01/22/2012[4] uniform officers from the Cobb County Police Department were dispatched to 1967 Leland Drive, Marietta 30067 (Cobb County) in reference to a report of the odor of marijuana detected in a hallway. This address is the Extended Stay America. Upon arrival

---

[4] The date was a typographical error and should have stated February, not January. 1T15-15.

Office Harder detected a strong odor of marijuana in the hallway of the third floor. Officer knocked on room doors [sic] 314 because noises were heard within. Officers did not smell odor of marijuana at this room, but checked room 319, where there was a strong smell of perfume. They knocked on the door; no one answered the door. A few minutes later, however, two young girls exited room 314. Officers made contact with them. The girls gave false names and DOBs to the officers. Officers were able to determine that the girls [were] both minors; one had been reported as a runaway from Another Chance. The second female had an active warrant for shoplifting in Douglas County.

Det. Largent, of the Crimes Against Children Unit, spoke briefly with the girls. They stated that they had both run away from Another Chance and had met up with an adult male. The adult male reportedly transported the girls to an unknown location in Atlanta and forced them to "turn tricks." An adult male then brought the juvenile females to the Extended Stay America. Each juvenile was forced to have sex with a male. Both juveniles were also made to have sex with a third male. Condoms were used. The juveniles stated that the bed clothing had not been changed. The juvenile females stated that a gun was hidden behind a microwave in the room.

While retrieving the juvenile's belongings, officers were able to see the end of what appeared to be the grip of a handgun behind the microwave in the room.

The affiant request[s] the authority to search the room (#314) for evidence to include a handgun, condoms (new and or used), bed linens (sheets, blankets, pillow cases, bodily fluids (blood, urine[,] semen, etc., lubricant, ledgers or other paper records of prostitution, money, and photographs.[5]

---

[5]     Detective Loiselle also provided oral testimony via video conferencing with the Cobb County Magistrate. Gov't Ex. 2. This testimony was not transcribed for the record. The Court has reviewed the DVD for consistency with the written affidavit submitted to the issuing judge. The oral testimony included the following additional

AO 72A
(Rev.8/8
2)

Gov't Ex. 1 at 5. A Cobb County Magistrate issued the warrant for room 314. Gov't Ex. 1. The room was searched, resulting in the seizure of multiple used condoms, multiple unopened condoms with boxes, a Sig Sauer model P220 pistol, IntegriSwabs from the mattress, cigarette butts, grey pants, miscellaneous papers and business cards, cigarettes in a box, sheet sets from two beds, and the comforter and mattress pad for the two beds. *Id.*

B.     *The Parties' Contentions*

The government argues that the initial warrantless entry by the officers was justified as a protective sweep or due to the exigency created by an unattended firearm in the motel room. [Doc. 124 at 21-28]. The government alternatively argues that the search warrant was supported by probable cause even in the absence of the officers' observations during the initial warrantless entry, and thus the officers discovered the evidence in the hotel room from an independent, lawful source, i.e., the information

---

facts: Loiselle testified that one of the girls stated she overheard a conversation between the male who took them to the Extended Stay ("the Atlanta male") and the male to whom they were handed off at the Extended Stay ("the Extended Stay male"), to the effect that the Atlanta male owed the Extended Stay male money. DVD at 6:50. She also reported to the magistrate that the girls had been brought to the Crimes Against Children Unit to be interviewed. In addition, contrary to the written affidavit, the DVD appears to reflect that Loiselle reported that the officers did *not* smell marijuana upon their entry onto the third floor hallway.

9

from AC and OM.  [*Id.* at 33-34].  The government also argues that the discovery of the evidence inside the motel room was inevitable since the officers already had decided to seek a search warrant before conducting the protective sweep.  [*Id.* at 34-37]. Finally, the government argues that the good-faith exception applies to prevent suppression of the fruits of the search even if the search warrant was not based on probable cause.  [*Id.* at 37].

Hill counters that the government has completely changed its position, having told the issuing magistrate that the officers entered the motel room to retrieve the girls' belongings, but is now relying on the protective sweep/exigency rationale in this court.  [Doc. 131 at 1-2].  In addition, he argues that neither the protective sweep nor exigent circumstances justified the warrantless entry into the motel room, because the police had no information that any other person was inside the room necessitating the protective sweep, [*id.* at 8-9], and in any event, there was no need to conduct a protective sweep because the officers were outside the room and not at risk, [*id.* at 10]; and there was no exigency in entering the motel room to obtain the unattended firearm, since the room was guarded by Mangold and the officers had plenty of time to secure a warrant.  [*Id.* at 11-13].  He distinguishes *United States v. Newsome*, 475 F.3d 1221 (11th Cir. 2007), and *United States v. Bushay*, 859 F. Supp. 2d 1335 (N.D. Ga. 2012)

10

AO 72A
(Rev.8/8
2)

(Batten, J., affirming Baverman, M.J.), since Hill's lawful occupancy of the motel room had not yet ended, as had occurred in *Newsome* and *Bushay*.  [Doc. 131 at 13-14].

Hill also argues that the remaining information in the affidavit—the information from AC and OM—was insufficient to support a finding of probable cause to issue the search warrant for the motel room.  He argues that the state magistrate was not advised that the juveniles lied about their identities and ages.  Further, the girls gave no information about who forced them into sex, and the affidavit did not detail information about which room the sex occurred.  [*Id.* at 17-18].  As a result, he argues, the affidavit without the corroborating detail of the officers' seeing the firearm, is a bare-boned affidavit lacking probable cause.  [*Id.* at 19].

Hill next argues that in determining whether the good-faith exception applies, the Court must determine whether the illegal warrantless entry prompted the officers' decision to obtain a search warrant.  In that regard, he argues that the detectives' testimony that they had intended on getting a warrant from the beginning, before even acquiring probable cause, is incredible hyperbole, and that the Court should find that the testimony is just a cover for the warrantless (but corroboratory) entry into the motel room.  [*Id.* at 20-23].

11

In his brief, Murray[6] repeats many of Hill's arguments, plus he argues that the sole purpose of entering the room without a warrant was to search for evidence and that there was no exigency mandating immediate entry into the room.  [Doc. 130 at 3-5]. He then argues that the officers conducted an actual search of the room and did not limit their entry to the protective sweep for persons, because they sought to confirm the presence of the firearm behind the microwave.  [*Id.* at 4].  Murray also argues that there was no exigency justifying the warrantless entry since there were armed, uniformed officers standing guard at the motel-room door preventing anyone from entering, and thus there was no danger of harm to police officers or the general public.  [*Id.* at 4-5].

Murray further contends that the warrant was tainted by the initial entry, and in looking at the balance of the information in the affidavit, like Hill, he contends that the information provided by the girls was not linked to room 314.  [*Id.* at 8].  He also argues that there was no nexus between room 314 and any other persons except the juveniles.  [*Id.* at 10-11].  Finally, he argues that the good-faith exception is not applicable under the facts of this case.  [*Id.* at 11-12].

---

[6]     The government did not challenge Murray's standing to contest the search of room 314.

12

In reply, the government argues that the information received from AC and OM was credible and supported a finding of probable cause, since they made admissions against their penal interest and described conduct which occurred in their presence (and to them) in the room.  [Doc. 132 at 3].  The government argues that, in any event, the information was not so lacking in probable cause so as to prevent the good-faith exception from applying.  [*Id.* at 8-12].

C.    *Discussion*

Search warrants are presumed to be validly issued.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  Usually, when there is a search warrant, the defendant has the burden of establishing that the warrant was defective or executed improperly.  *Id.; United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B 1981); *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980).[7]  On the other hand, where law enforcement makes an initial warrantless entry into a location and then obtains a search warrant, the government bears the burden to establish, by a preponderance of the evidence, that the search warrant was obtained based upon information from an independent source. *Nix v. Williams*, 467 U.S. 431,

---

[7]      In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

444 & n.5 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received."); *United States v. Jones*, 433 Fed. Appx. 825, 828 (11th Cir. July 11, 2011) (holding that " 'if the search warrant was obtained based upon information from an independent source, then the warrantless entry, even though illegal, [does] not require exclusion of [the] evidence.' ") (quoting *United States v. Glinton*, 154 F.3d 1245, 1254 (11th Cir. 1998)); *see also Segura v. United States*, 468 U.S. 796, 805 (1984) (explaining that exclusionary rule is not implicated when government learns of challenged evidence from independent source); *United States v. Davis*, 313 F.3d 1300, 1303 (11th Cir. 2002) (Under the independent-source doctrine, even where a Fourth Amendment violation has occurred, evidence "obtained from a lawful source, independent of the illegal conduct" is admissible.).  As the Eleventh Circuit has explained:

> When the affidavit for the search warrant contains information obtained as a result of the initial warrantless entry, "we . . . look to whether the other information provided in the affidavit is sufficient to support a probable cause finding." *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999).    . . .    "If so, suppression is not required . . . provided . . . that 'the agents' decision to seek the warrant was not prompted by what they had seen during the initial entry.' " *Chaves*, 169 F.3d at 692-93 (quoting *Murray* [*v. United States*, 487 U.S. 533, 542 (1988)].

*Jones*, 433 Fed. Appx. at 828.

Therefore, assuming without deciding that the initial warrantless entry was not authorized,[8] and setting aside what the officers learned from their warrantless entry into

---

[8]      The Court doubts that the protective sweep doctrine justified the entry into the room.  In *Maryland v. Buie*, 494 U.S. 325, 337 (1990), the Supreme Court held that a protective sweep (in the context of an at-home arrest) may be lawfully undertaken where the police "possess[ ] a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene."  Most courts agree with the Eighth Circuit's statement that " '*Buie* authorizes protective sweeps for unknown individuals in a house who may pose a threat to officers as they effectuate an arrest; *Buie* does not allow a protective sweep for weapons or contraband.' "  *United States v. Williams*, 577 F.3d 878, 881 n.3 (8th Cir. 2009) (quoting *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005) (citing cases)).  (The Court has not located an Eleventh Circuit case addressing the issue, but notes that *United States v. Bennett*, 555 F.3d 962 (11th Cir. 2009), is not really instructive.  There, law enforcement arrested a suspect in a residence and searched under the mattress of a bedroom where two teenagers were seated because the area was within their "grab area."  Thus, *Bennett* is not instructive because even if it falls under *Buie*, it concerns the scope of a legitimate *Buie* sweep.)  Here, the officers had no reasonable belief based on specific and articulable facts that anybody was in the room after the girls exited.

Likewise, exigent circumstances did not authorize the warrantless intrusion. "[T]he 'presence of contraband without more does not give rise to exigent circumstances.' "  *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc) (quoting *United States v. Torres*, 705 F.2d 1287, 1297 (11th Cir.), *vacated and remanded on other grounds*, 718 F.2d 998 (11th Cir. 1983)).  "[A]n exigency exists when officers can articulate a reason, grounded in the facts of the specific case, to fear that evidence may be destroyed or lost . . . ."  *United States v. Bradley*, 644 F.3d 1213, 1262 (11th Cir. 2011).  "An objective test applies to the exigency determination.  An exigency exists if 'the facts . . . would lead a reasonable, experienced agent to believe that evidence *might* be destroyed before a warrant could be secured.' "  *Id.* (emphasis and alteration in original) (quoting *Tobin*, 923 F.2d at 1510).  There is no evidence

15

room 314 (the firearm behind the microwave), the Court evaluates whether the government has established that probable cause supported the issuance of the warrant based on the other information proffered to the issuing magistrate.  Probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location.  *See United States v. Noriega*, 676 F.3d 1252, 1261 (11ᵗʰ Cir. 2012); *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11ᵗʰ Cir. 1991).  "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts[.]"  *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *United States v. Brundidge*, 170 F.3d 1350, 1352 (11ᵗʰ Cir. 1999).  "[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' "  *Gates*, 462 U.S. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  The task of the magistrate judge in determining whether to issue a warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons

---

from which the Court could conclude that the officers had a reasonable belief that evidence might be destroyed.

supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 232; *United States v. Jiminez*, 242 F.3d 1243, 1248 (11th Cir. 2000).    Under the *Gates* totality-of-the-circumstances test, the "veracity" and "basis of knowledge" prongs for assessing the usefulness of an informant's tips, are not independent.  "[T]hey are better understood as relevant considerations in the totality of the circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for . . . by a strong showing as to the other[.]"  *Gates*, 462 U.S. at 233; *Brundidge*, 170 F.3d at 1353.  That is, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir.  2002) (citing *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)).   However, independent police corroboration  is  not  a  requirement  in  each  and  every  case.     *Brundidge*, 170 F.3d at 1353.  For example, "[a]n 'explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles the [informant's] tip to greater weight than might otherwise be the case.' "  *United States v. Robinson*, 202 Fed. Appx. 434, 436 (11th Cir. Oct. 27, 2006) (quoting *Brundidge*, 170 F.3d at 1353) (citations omitted in original); *see also Gates*, 462 U.S. at 234

AO 72A
(Rev.8/8
2)

(explaining that an "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles [the informant's] tip to greater weight than might otherwise be the case").  In addition, probable cause has been found where the source of the information made a statement against his or her penal interest to police.  *Robinson*, 202 Fed. Appx. at 436 (citing *United States v. Farese*, 612 F.2d 1376, 1378 (5th Cir. 1980)).  *But see Oregon v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (recognizing that making a statement against one's penal interests, without more, will not raise an informant's tip to the level of probable cause required under the Fourth Amendment) (citing *United States v. Martin*, 615 F.2d 318, 325 (5th Cir. 1980)).

"The question of what amounts to probable cause is purely a question of law . . . ."  *Tobin*, 923 F.2d at 1510 (citations and internal quotation marks omitted). Moreover, probable-cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been.  *See, e.g., Whren v. United States,* 517 U.S. 806, 813-14 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas v. United States,* 517 U.S. 690, 696 (1996) (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable

18

police officer"); *United States v. Roy,* 869 F.2d 1427, 1433 (11th Cir. 1989) (rejecting notion that probable cause turns on what law enforcement officers think and holding that "[c]ourts determine the existence of probable cause"); *see also Horton v. California,* 496 U.S. 128, 138 (1990) ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").

Finally, "probable cause must exist when the magistrate judge issues the search warrant," *United States v. Santa*, 236 F.3d 662, 672 (11th Cir. 2000) (quoting *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)); because a search is not to be made legal by what it turns up. *United States v. Di Re*, 332 U.S. 581, 595 (1948).

Next, the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant, *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984), affording "great deference to judicial determination of probable cause to issue a search warrant." *United States v. Robinson*, 62 F.3d 1325, 1331 (11th Cir. 1995) (citing *Gonzalez*, 940 F.2d at 1419). Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be

19

employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable-cause determinations. *Gates*, 462 U.S. at 236-37 (citing *United States v. Ventresca,* 380 U.S. 102, 109 (1965)); *see also United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994). As the Supreme Court has instructed, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Upton*, 466 U.S. at 734 (quoting *Ventresca*, 380 U.S. at 109).

The affidavit in this case, even without the corroborating observations of the warrantless search, established probable cause because the information provided by the juvenile girls was adequately corroborated and thus could objectively be relied upon to support a finding of probable cause.[9] First, the juveniles gave statements that corroborated each other. *United States v. Hyde*, 574 F.2d 856, 863 (5th Cir. 1978); *United States v. Ridolf*, 76 F. Supp. 2d 1305, 1308 (M.D. Ala. 1999) ("[T]he court

_____

[9]     The Court rejects Hill's argument that the state magistrate was not advised that the girls initially lied about their identities and dates of birth. Detective Loiselle's affidavit expressly provided that, "The girls gave false names and DOBs to the officers." Gov't Ex. 1.

20

could stop its inquiry at this point and simply conclude that there was probable cause based upon the demonstrated knowledge of the informants, the fact that they were participates [sic] in the alleged transactions, and the fact that there were multiple informants telling the police essentially the same thing.").[10]

Second, the information they provided demonstrated that their knowledge was first hand, because they participated in the conduct—sex with adults—they described. Although the girls at first lied about their identities and ages, they subsequently gave their real names and acknowledged being runaways from a juvenile center, information that was then corroborated by the police.

Moreover, the girls' information was sufficiently detailed.  They described meeting up with a man who had sex with them in Atlanta (Fair Oaks) and who had them engage in prostitution, after which they were transported to the Extended Stay in

---

[10]     The Court recognizes that the girls did not tell separate and independent corroborating stories because, at least before Largent interviewed them at the Crimes Against Children Unit, it appears that all of the information Loiselle included in the warrant application came from the girls' joint interviews with the police. However, the other factors discussed in the text mitigate any deficiency resulting from the joint interviews.

21

Marietta, where they then each engaged in sex acts with two other men.[11]  They described a conversation between the two of the men about a debt; told Detective Largent that condoms were used during sex and that the room had not been cleaned since the last sex acts; and identified a specific place in the room where a firearm could be found.

Finally, both girls were in custody when they gave this information to the police. While Defendants contend that this gave them an additional motive to lie, the Court disagrees.  Corroboration of an informant's information may be found where there exists a disincentive for the informant to lie.  *United States v. Foree*, 43 F.3d 1572, 1576 (11th Cir. 1995) (holding that a tip is corroborated when given in "circumstances under which [the informant] is unlikely to lie" because a falsehood "would likely be discovered in short order and favors falsely curried would dissipate rapidly").  Here, the truth or falsity of their information would become known to the police in short order, and since the girls were in official custody in the back of a police car guarded by at least one police officer at all times, any untruthful statements would be discovered quickly and likely could cause them to suffer adverse consequences. Although Largent told them that the ordeal would soon be over, it is reasonable to

---

[11]     None of the mem with whom the girls had sex were identified by name.

22

conclude that the girls recognized that the ordeal would end only if the information they provided turned out to be correct.

One final point.  Defendants contend that there was no connection between room 314 and the conduct the girls described.  This is the "hypertechnical" reading of the affidavit that the case law eschews in reviewing warrants.  *United States v. Segura-Baltazar*, 448 F.3d 1281, 1291 (11th Cir. 2006); *Miller*, 24 F.3d at 1361. Rather, it is clear from a "realistic and commonsense approach," *id.*, that the girls and the affidavit refer to conduct occurring in room 314, the room from which they initially exited in their encounter with Harder and about which they answered Largent's questions as to the use of condoms, whether it had been cleaned, and the presence of the firearm behind the microwave.  As for Murray's argument that there was no nexus between the room and any other person other than the girls, that argument would apply where the police were seeking to connect a suspect's residence or motel room to a crime that occurred elsewhere.  That is because "[p]robable cause to search a [location] requires some nexus between the premises and the alleged crime."  *United States v. Joseph*, 709 F.3d 1082, 1100 (11th Cir. 2013) (quoting *United States v. Bradley*, 644 F.3d 1213, 1263 (11th Cir. 2011)); *see also United States v. Grubbs*, 547 U.S. 90, 95 (2006) ("Probable cause exists when 'there is a fair probability that

23

contraband or evidence of a crime will be found in a particular place.' ") (quoting *Gates*, 462 U.S. at 238).  Here, the crimes were alleged to have occurred in room 314, and thus probable cause was established.

Thus, the Court concludes that independent of the officers' observations during the warrantless entry, the subsequent search warrant was supported by probable cause.

The Court also concludes that the officers were not motivated or prompted by the fruits of the warrantless entry to seek the search warrant, but instead recognized that the information received from Harder on the scene would require application for a search warrant.  To determine whether the officers' decision to seek a warrant was prompted by what they saw during the initial entry, courts ask whether the officers would have sought the warrant even if they had not entered.  *Murray*, 487 U.S. at 542 n.3; *Noriega*, 676 F.3d at 1252.  If they would have done so, the decision to seek the search warrant is supported by an "independent source" and the evidence seized under the warrant is admissible regardless of whether the initial entry violated the Fourth Amendment. *Noriega*, *id.*; *Chaves*, 169 F.3d at 692-93.

In this case, Detective Largent was one of the two investigators to first arrive on the scene.  2T23-24.  Prior to this incident, she had been involved in eight to ten child

24

exploitation cases, of which at least one involved a search warrant. 2T21. After being

briefed by Harder, she got into the police car with the girls.

> When I got in the car with them they were both crying. And I asked them
> why they were crying, and they said they were scared. I asked them why
> they were scared, and they said that the male subjects that they had been
> in the hotel with were still in the vicinity, but they didn't know where they
> were. And even as I'm talking to them the girls are looking around to try
> and see if they can see whoever it is that they were trying to describe to
> us. And I assured them that they would be safe inside the car with me and
> that we weren't going to be there that long. They really were genuinely
> scared. They seemed to be genuinely scared. And so I then determined
> that they were both 14 -- I asked them how old they were. They both said
> they were 14. I explained to them who I was and why I was there. *And
> I told them that there was some questions I needed to ask them. And I
> asked them if sexual activity had occurred in the hotel room that they had
> come out of, and they both said yes. I asked them if there were any
> condoms used, and they both said yes. And I asked them if the cleaning
> people had come in and changed any of -- any of the linens had been
> changed. Because these are things I know already that I'm going to need
> to know in order to get a search warrant to get into the hotel room if
> there's any physical evidence, D.N.A., that kind of thing. So based on the
> information that they told me I knew those were things that we were going
> to be looking to get from the room. And then when I asked them if there
> was anything else in the room that we needed to be aware of, they both
> told me that there was a pistol hidden behind the microwave in the room.*

2T25-26 (emphasis added); *see also* 2T26 (Q. So do I understand your testimony,

Detective Largent, to be that prior to the disclosure of the firearm . . . you are already

formulating the information that you'll need to obtain a search warrant? A. Yes.);

*id.* ("At that point I spoke with Sergeant Brown on the phone. He was not on the scene

AO 72A
(Rev.8/8
2)

yet.  And he wanted to know what our status was, and I explained to him what evidence we might be needing to get from the room.  *Because we already know ahead of time that we're going to be getting a search warrant.*  It's just a matter of what list of things it is that we're going to be looking for.") (emphasis supplied).  Then, when Detectives Brown and Drew arrived on the scene shortly afterward, "we kind of all met together to talk about what evidence might be in the room, *what things we need to articulate in the search warrant.  And at that time is when I told them, hey, the girls just let me know there's probably a weapon inside the room behind the microwave*."  *Id.* at 28-29.

Detective Drew was involved in five to six child exploitation cases, and search warrants were sought in all of them.  1T47.   He testified that the presence of the firearm did not impact the decision to seek a warrant because there was much more evidence they were seeking in investigation of child-exploitation cases.  *Id.* at 48-49. He believed they were going to apply for a search warrant almost immediately since "there's an abundance of evidence in that room if that's where they were just coming from.  So, I mean, that was probably one of the first things that we talked about, this – we needed to get that room secured, we needed to get – have to get a search warrant, we need to get information from the girls to establish that."  *Id.* at 54; *see also id.* at 55  ("I mean, that's pretty standard practice.  I mean, that's – you know, one of

26

the first things that we're going to do in any investigation like this, is get a search warrant for the room.").

On the basis of this testimony, the Court concludes that the government has established that the officers would have sought a search warrant even if they had not entered the room initially without a warrant. The Court recognizes that the officers did not apply for a warrant until after they entered the room, but the nature of the crime under investigation—exploitation of children for sex, commercial or otherwise—is the type of offense that lends itself to the collection of physical evidence: bodily-fluid samples, condoms, bedding, etc. The detectives articulated that these were the type of items they expected to need a warrant to obtain, and the Court finds their testimony credible.

In addition, the Court is not deeply troubled by what Hill calls the detectives' change in position. That is, Loiselle wrote in the affidavit that the firearm was observed when the officers on the scene entered the room to retrieve the girls' clothing, while the police who were at the scene did not testify about being motivated to go to the room to retrieve the girls' clothing. The Court views the events objectively to determine whether the mandate of the Fourth Amendment has been fulfilled; this analysis is not based on what motivated the officers to enter the room. Also, there were

27

discussions between the officers on the scene and the girls about retrieving their belongings.  2T31.  In any event, this contradiction would matter if the Court doubted what information the girls provided which established probable cause.  Since the Court concludes that the sufficiency of the warrant is established by the information the officers learned before they entered the room without a warrant, the reason the officers entered the room is less important.

Thus, for all of these reasons, the undersigned finds that the items seized as a result of the warrant were properly obtained under the independent source doctrine.

Because the undersigned concludes that probable cause existed to support the issuance of the warrant even assuming the initial warrantless entry was unlawful, and that the officers were not prompted to obtain a warrant by what they saw during the initial warrantless entry, the warrant was validly issued, and the Court need not address whether the inevitable discovery doctrine applies or suppression of the evidence is saved by application of the good-faith exception to the exclusionary rule established by *United States v. Leon*, 468 U.S. 897 (1984).

For all of the above and foregoing reasons, the undersigned **RECOMMENDS** that Defendants' motions to suppress evidence, [Docs. 46, 71, 80 and 96], be **DENIED**.

28

AO 72A
(Rev.8/8
2)

### III.   Motion to sever

Hill moves to sever the felon-in-possession-of-a-firearm count (Count Four) from the trial on the sex-trafficking counts. [Doc. 48].  While apparently conceding that the government would prevail on a misjoinder argument since it will contend the firearm was used to commit one or more of the sex-trafficking charges, he nonetheless argues that under Rule 14 of the Federal Rules of Criminal Procedure, he is entitled to severance due to prejudicial joinder. [Doc. 48 at 2].  In this regard, he argues that he will be unduly prejudiced by the jury's hearing that he is a convicted felon. [*Id.* at 4].

The government opposes the motion, arguing that prejudice can be minimized by a stipulation of Hill's felony status, the government's promise not to emphasize that status, and an instruction to the jury from the District Court. [Doc. 85 at 11-12].  Also, the government argues that the firearm possession is part of the same transaction as the sex-trafficking counts, because at least as to AC and OM, the expected testimony at trial is that they were afraid of Hill and Murray and were aware of the firearm and that Hill "racked" the firearm when the girls initially refused to pose nude for photographs (which were then posted on the internet as advertisements for prostitution). [*Id.* at 11].

The Eleventh Circuit's precedent sets out a two-step analysis to determine whether separate charges are properly tried at the same time. *See United States v.*

29

AO 72A
(Rev.8/8
2)

*Hersh*, 297 F.3d 1233, 1241 (11th Cir. 2002); *United States v. Walser*, 3 F.3d 380, 385 (11th Cir. 1993).  First, the Court must consider whether the initial joinder of charges was proper under Rule 8(a) of the Federal Rules of Criminal Procedure.  Second, the Court considers whether prejudice to the defendant resulting from joinder mandates severance under Rule 14.  *Hersh, supra; Walser, supra.*

Rule 8(a) provides, in relevant part:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged - - whether felonies or misdemeanors or both - - are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Rule 8(a) is construed broadly in favor of initial joinder.  *Walser*, 3 F.3d at 385. In this case, the government alleges that the firearm count is part of the same common scheme or plan as some of the sex-trafficking counts.  A court can consider the government's pretrial representations of commonality in determining whether joinder is proper.  *United States v. Ajouny*, 629 F.2d 830, 842 (2d Cir. 1980).  *Cf. Hersh*, 297 F.3d at 1241 n.10 (similarity of offenses for purposes of joinder under Rule 8(a) can be apparent from the face of the indictment or by the government's representations before trial, if such representations are borne out in the evidence presented during trial); *United States v. Dominguez*, 226 F.3d 1235, 1240-41 (11th Cir. 2000) (same).  *But see*

*United States v. Terry*, 911 F.2d 272, 276 (9th Cir. 1990) ("Because Rule 8 is concerned with the propriety of joining offenses in the indictment, the validity of the joinder is determined solely by the allegations in the indictment.").

Thus, joinder may be appropriate where diverse acts constitute parts of a common scheme or plan. Rule 8(a); *United States v. Williams*, 177 Fed. Appx. 914, 924 (11th Cir. Apr. 24, 2006) (firearm charge properly joined with drug charges because it was based on the same act or transaction as drug charges, since weapons and drugs were found at same time and one of the weapons was found in the same place as the drugs); *United States v. Abshire*, 471 F.2d 116, 118 (5th Cir. 1972) (joinder of charge of interstate transportation of stolen motor vehicles and charge of interstate transportation of firearm by felon held proper under Rule 8(a) because "both offenses arose out of the same sequence of events").

In this case, joinder was proper under Rule 8(a) because the government intends to demonstrate that the firearm was used in the commission of the offenses involving AC and OM.

The next inquiry is conducted pursuant to Rule 14(a), which provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant

31

> or the government, the court may order separate trials of counts, sever the
> defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a).  A defendant has to show that joinder will cause compelling

prejudice against which the district court can offer no protection.  *Walser*,

3 F.3d at 385.  Demonstrating compelling prejudice is "a heavy burden." *United States*

*v. Hogan*, 986 F.2d 1364, 1375 (11th Cir. 1993).  "The test for assessing compelling

prejudice is whether under all the circumstances of a particular case it is within the

capacity of jurors to follow a court's limiting instructions and appraise the independent

evidence against a defendant solely on that defendant's own . . . conduct in relation to

the allegations contained in the indictment and render a fair and impartial verdict."

*Hersh*, 297 F.3d at 1243; *Walser*, 3 F.3d at 386-87.  If so, "though the task be difficult,"

there is no compelling prejudice.  *Id.* (citation omitted).  If the prejudice may be cured

by a cautionary instruction, severance is not required.  *Walser*, 3 F.3d at 387; *United*

*States v. Jacoby*, 955 F.2d 1527, 1542 (11th Cir. 1992).

In this case, the District Court likely will charge the jury that it must consider

separately the evidence for each count and against each defendant.  A jury is presumed

to be able to follow the court's instructions and evaluate the evidence as to each count

independently.  *See Walser*, 3 F.3d at 387; *see also United States v. York*,

32

428 F.3d 1325, 1334 (11th Cir. 2005) (district court did not abuse its discretion where "the jury was expressly instructed that it was to consider each count of the Indictment separately and was further instructed that merely finding [the defendant] guilty of one charged offense was not to influence its verdict as to the other charged offenses.").

In addition to the Court's instructions, any possible prejudice can be lessened by a stipulation to Hill's felony status, *see United States v. Albertie*, 382 Fed. Appx. 876, 879-80 (11th Cir. June 14, 2010) (recognizing that when a defendant is charged as a felon in possession of a firearm, evidence concerning the nature of the prior felony offense is improperly admitted when the defendant otherwise admits his status as a felon because the risk of unfair prejudice substantially outweighs the probative value of the evidence) (citing *Old Chief v. United States*, 519 U.S. 172, 174, 185 n.8 (1997)). Also, the government has represented that it will not emphasize Hill's prior record outside of proving his felony status.

Given the mechanisms to alleviate any prejudice which Hill might potentially suffer from the introduction of his felony status at trial, and the relevance of the firearm to the government's case such that the possession of the firearm will likely be admitted at trial, the Court is unable to conclude that Hill will suffer compelling prejudice by the

33

joinder of the felon-in-possession count with the sex-trafficking counts.  Therefore, the undersigned **RECOMMENDS** that Hill's severance motion be **DENIED**.

*IV.    Conclusion*

For all of the above reasons, the undersigned **RECOMMENDS** that Joshua Thomas Hill's motions to suppress evidence, [Docs. 46, 71, and 96], and to sever Count 4, [Doc. 48], and Fabian Terran Murray's motion to suppress, [Doc. 80], be **DENIED**.  To the extent that Hill challenges the search of the cell phone as part of his motions to suppress evidence, the undersigned **RECOMMENDS** that the motion be **DENIED** because he did not establish that he had standing to contest its seizure or search.  The undersigned further **RECOMMENDS** that Murray's motion to suppress identification, [Doc. 81], be **DENIED AS WITHDRAWN**.

The Court has now ruled upon all pretrial motions that have been referred to it. Accordingly, the case as to these two Defendants is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the 26th day of August, 2013.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)