IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.                                              1:12-cr-285-WSD-01-02

JOSHUA THOMAS HILL, and
FABIAN TERRAN MURRAY,

                    Defendants.

## OPINION AND ORDER

This matter is before the Court on Magistrate Judge Alan J. Baverman's

Final Report & Recommendation [137] on Joshua Thomas Hill's motions to

suppress evidence [46, 71, and 96] and to sever Count Four [48], and Fabian

Terran Murray's motion to suppress evidence [80].[1]

I.     BACKGROUND

       A.     Facts

By a superseding indictment filed on October 23, 2012, Hill, Murray, and a

third individual are charged with conspiring to commit sex trafficking of minors

---

[1] At the evidentiary hearing, Defendant Murray withdrew his Motion to Suppress
Identification [81].  Magistrate Judge Baverman recommended the motion be
denied as withdrawn.  Murray did not object to this recommendation.

(Count One) and the substantive offenses of sex trafficking of minors (Counts Two and Three).  Hill is also charged with possession of a firearm by a convicted felon (Count Four).  Hill and Murray each seek to suppress the results of the search of room 314 at the Extended Stay America in Marietta, Georgia, that was conducted on February 22, 2012.  Hill also seeks to sever Count Four from the other counts in which he is charged.

The parties have not objected to any specific facts set out in the R&R, and finding no plain error in the Magistrate Judge's findings, the Court adopts them. See Garvey v. Vaughn, 993 F.2d 776, 779 n.9 (11th Cir. 1993).[2]

On February 22, 2012, at around 1:00 p.m., uniformed Cobb County Police Officers Harder and Mangold responded to a call reporting the smell of marijuana on the third floor of the Extended Stay America in Marietta, Georgia, specifically from room 314, 319, or 340.  (R&R at 2.)  After speaking with the

---

[2] Hill notes in his objections that he objects to the omission of various unspecified facts.  (Hill's Objections to the R&R [145] 3 n.1.)  These objections do not specify specific factual findings that Hill objects to, and therefore his objections are not considered in the factual background.  Heath v. Jones, 863 F.2d 815, 822 (11th Cir. 1989) ("to challenge the findings and recommendations of the magistrate [judge], a party must . . . file . . . written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection"); Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988) ("Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to.  Frivolous, conclusive, or general objections need not be considered by the district court.").

manager, the officers took the elevator to the third floor where they smelled

marijuana.  Id.  While attempting to pinpoint which room was the source of the

smell, a girl who appeared to be younger than fifteen years old, later identified as

O.M., emerged from room 314.  (Id. at 2-3.)[3]  Officer Harder asked for her name

and date of birth, and she stated that her name was Shay Obrono.  (Id.)  The birth

date she gave was not consistent with Officer Harder's belief about her age.  (Id.)

Another young-looking girl, later identified as A.C., next emerged from room 314.

(Id.)  She gave her name as Thiana Obrono.  (Id.)  When questioned, Shay stated

that she attended school in Marietta, and Thiana said she attended school in

Osborne, but was currently suspended.  (Tr. of Magistrate Proceedings [99] 96.)

Officer Harder asked the girls for phone numbers for their parents.  (R&R at 3.)

They gave telephone numbers to Officer Harder, but when they were called, the

numbers were either out of service or the call went to voicemail.  (Id.)  Officer

Harder concluded the girls were being deceptive.  Id.

Officer Harder asked to hold the cell phone that Shay was holding because

calls and texts to it interfered with his questioning.  (Id.)  Shay handed him the

---

[3] Defendant Hill was the registered occupant of room 314 from February 20-23, 2012.  (Tr. of Magistrate Proceedings [112] 7-8.)

phone.  (Id.)[4]  After additional questioning, the girls gave Officer Harder their real

names.  (Id.)  A records check showed that A.C. was wanted on a Douglasville

warrant for misdemeanor shoplifting and that O.M. had been reported as a

runaway.  (Id. at 4.)  Both girls were taken downstairs and placed in the back seat

of Officer Harder's patrol car.  (Id.)  A.C. was handcuffed because she had a

warrant against her.  (Id.)  O.M. was not handcuffed.  (Id.)  Another officer arrived

to stay with the girls while Officer Harder further investigated.  (Id.)

Officer Harder spoke again with the motel manager, who said that room 314

was rented to Joshua Hill and that motel employees had reported that Hill and two

other males had been seen walking on the third floor.  (Id. at 5.)  The manager also

stated that the two girls had come to the front desk on February 21st to make a

payment for the room, although he said that the girls could not remember the room

number at the time.  (Id.)  Because he was dealing with young girls, Officer Harder

---

[4] The cell phone was ultimately searched by warrant.  Hill originally moved to
suppress the fruits of that search with the search of the motel room, but Hill never
made a request for an evidentiary hearing on the phone's seizure, and the seizure of
the phone was not raised in any post-evidentiary hearing brief.  The Magistrate
Judge recommended that, to the extent that Hill challenges the cell phone search
and seizure, it should be denied because Hill did not establish standing by showing
that he had a legitimate expectation of privacy in the cell phone.  Hill did not
object to this finding and conclusion.  The Court finds no plain error in this
conclusion.  See United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008) (the
defendant bears the burden of showing a legitimate expectation of privacy in the
area searched).

called Detective Drew at the Cobb County Crimes Against Children Unit. Detective Drew told Officer Harder to obtain more information from the girls. (Id.)

When Officer Harder opened up the door to have A.C. step out of the car, she told him that he needed to "get the really bad people." (Id.)  Officer Harder put Detective Drew on speakerphone so that Drew could hear the conversation.  (Id.) During the call, A.C. admitted to Officer Harder that she and O.M. had run away from Another Chance, a juvenile group home.  (Id.)  She said she and O.M. were picked up by a male at Fair Oaks Park, and that they were now "tricking" (prostituting).  (Id.)  Officer Harder, at this point, discontinued the interview so that it could be continued by the detectives from the Crimes Against Children Unit. (Tr. of Magistrate Proceedings [99] 102.)

Detective Drew sent detectives to the motel, and Officer Harder directed Officer Mangold to stand guard outside room 314.  (R&R at 5.)[5]  The girls were upset, scared, and very chatty.  A.C. stated that people were watching them, and O.M. stated that "we shouldn't do this, we shouldn't do this."  (Id.)  To avoid others seeing the girls in his car, Officer Harder moved his vehicle to an area of the parking lot furthest from the motel.  (Id.)

---

[5] Room 314 had been unattended for almost thirty minutes.

Detectives Largent and Northop of the Crimes Against Children Unit went to the motel to investigate.  (Id. at 6.)  When they arrived, Officer Harder gave to Detective Largent the cell phone that he obtained from O.M.  (Id.)  After being briefed by Officer Harder, the detectives assumed responsibility for the investigation.  (Id.)  Detective Largent spoke to the girls inside Officer Harder's police car.  (Id.)  The girls were both crying, they stated they were fourteen years old, and were afraid because the men were still in the area.  (Id.)  Detective Largent asked the girls further questions to develop information for a warrant to search room 314.  (Id.)  The girls told Detective Largent that sexual activity had occurred in the room, condoms were used, and the linens on the bed had not been changed by the motel staff as of the time they encountered Officer Harder.  (Id.)  When asked if there was anything else about room 314 she needed to know, both girls told Detective Largent there was a pistol hidden behind the microwave.  (Id.)

A short time later, Sergeant Brown (also of the Crimes Against Children Unit) and Detective Drew arrived on the scene and discussed with Detective Largent the information they needed to state in an affidavit to support a search warrant application.  (Id.)[6]

---

[6] They also noted that the room had been unsecured for some period after the girls departed it, and they did not know if anyone was inside.

About an hour and a half to two hours after Officer Harder first encountered A.C. and O.M., uniformed officers and the detectives went to check the room.  (Id. at 7.)  While in the elevator, Detective Largent told Detective Drew the girls had reported there was a pistol in the room.  (Id.)  The uniformed officers decided to enter and clear the room, determining that no one was inside.  (Tr. of Magistrate Proceedings [99] 107.)  Detectives Largent and Northop followed the uniformed officers inside the room, and as they were leaving, Detective Northop saw the grip of a pistol hidden behind the microwave.  (R&R at 7.)

Detective Largent transported the girls to be interviewed at the Crimes Against Children Unit in Marietta.  Detective Drew called Detective Loiselle from the motel to report what he knew from the investigation for Detective Loiselle's use in preparing the warrant application.  (Id.)  The application, sworn to by Detective Loiselle at 5:51 p.m., provided as follows:

> On 01/22/2012[7] uniform officers from the Cobb County Police Department were dispatched to 1967 Leland Drive, Marietta 30067 (Cobb County) in reference to a report of the odor of marijuana detected in a hallway.  This address is the Extended Stay America. Upon arrival Officer Harder detected a strong odor of marijuana in the hallway of the third floor.  Officers knocked on room doors [sic] 314 because noises were heard within.  Officers did not smell odor of marijuana at this room, but checked room 319, where there was a

---

[7] The date was a typographical error and should have stated February, not January. (Tr. of Magistrate Proceedings [99] 16.)

strong smell of perfume.  They knocked on the door; no one answered the door.  A few minutes later, however, two young girls exited room 314.  Officers made contact with them.  The girls gave false names and DOBs to the officers.  Officers were able to determine that the girls [were] both minors; one had been reported as a runaway from Another Chance.  The second female had an active warrant for shoplifting in Douglas County.

Det. Largent, of the Crimes Against Children Unit, spoke briefly with the girls.  They stated that they had both run away from Another Chance and had met up with an adult male.  The adult male reportedly transported the girls to an unknown location in Atlanta and forced them to "turn tricks."  An adult male then brought the juvenile females to the Extended Stay America.  Each juvenile was forced to have sex with a male.  Both juveniles were also made to have sex with a third male.  Condoms were used.  The juveniles stated that the bed clothing had not been changed.  The juvenile females stated that a gun was hidden behind a microwave in the room.

While retrieving the juvenile's belongings, officers were able to see the end of what appeared to be the grip of a handgun behind the microwave in the room.

The affiant request[s] the authority to search the room (#314) for evidence to include the handgun, condoms (new and or used), bed linens (sheets, blankets, pillow cases, bodily fluids (blood, urine[,] semen, etc.[))], lubricant, ledgers or other paper records of prostitution, money, and photographs.

(Gov't Ex. 1 at 5.)  Detective Loiselle also provided oral testimony via video

conferencing to the Cobb County Magistrate to whom the search warrant

application had been submitted.  (Gov't Ex. 2.)[8]  Upon consideration of the

---

[8] This testimony was not transcribed for the record.  The Court reviewed the DVD to compare the information communicated to the magistrate judge orally and

application, the Magistrate issued a warrant for room 314.  (R&R at 9.)  The room

was searched, resulting in the seizure of multiple used condoms, multiple

unopened condoms and condom boxes, a Sig Sauer model P220 pistol, swab

samples from the mattress, cigarette butts, grey pants, miscellaneous papers and

business cards, cigarettes in a box, sheet sets from two beds, and the comforter and

mattress pad for the two beds.  (Id.)

On August 26, 2013, Magistrate Judge Baverman issued his R&R

recommending that the motions to suppress evidence, and Hill's motion to sever

Count Four, be denied.  Assuming, without deciding, that the initial warrantless

entry was not authorized and not considering what the officers learned during the

warrantless entry into the room, including observing the gun behind the

microwave, Magistrate Judge Baverman found that probable cause to issue the

search warrant for room 314 had been established based on the information in the

---

submitted in the written affidavit.  The oral testimony included the following
additional facts:  Detective Loiselle testified that one of the girls stated she
overheard a conversation between the male who took them to the Extended Stay
("the Atlanta male") and the male to whom they were handed off at the Extended
Stay ("the Extended Stay male"), to the effect that the Atlanta male owed the
Extended Stay male money.  (DVD at 6:50.)  She also reported to the magistrate
judge that the girls had been brought to the Crimes Against Children Unit to be
interviewed.  In addition, contrary to the written affidavit, the DVD appears to
reflect that Detective Loiselle reported that the officers did not smell marijuana
upon their original entry to the third floor hallway.

warrant application that was known to investigating personnel before the warrantless entry, including what was communicated to them by O.M. and A.C., and the information proffered to the Magistrate when the application for the warrant was made.  Magistrate Judge Baverman specifically found that the affidavit, provided in support of the warrant application, "even without the corroborating observations of the warrantless search, established probable cause because the information provided by the juvenile girls was adequately corroborated and thus could be objectively relied upon to support a finding of probable cause." (Id. at 20.) [9]

Magistrate Judge Baverman also concluded that joinder of Count Four is appropriate because the government intends to demonstrate that the firearm was used in the commission of the offenses involving A.C. and O.M.  (Id. at 31.)  He determined that any prejudice to Hill can be minimized through stipulations and jury instructions, and that the firearm is relevant to the government's case.  He recommended Hill's motion to sever be denied.  (Id. at 33-34.)

Defendant Murray objects to Magistrate Judge Baverman's finding that the

_____

[9] The government, in its Response in Support of the R&R [148], disagrees with the findings that the initial warrantless search was not authorized by exigent circumstances and the "doubts" that it was authorized as a protective sweep. (Gov't's Resp. in Supp. [148] 3 n.3.)  The Response is not stated in the form of objections to the R&R.

search warrant was supported by probable cause.  He asserts there is an insufficient connection between the information provided by the girls and the searched room which prevents a finding that there was probable cause to search room 314. (Murray's Objections to the R&R [141] 1-2.)

Defendant Hill objects to the Magistrate Judge Baverman's findings and conclusions in the R&R that (1) the warrantless entry was not the motivation to seek the search warrant, (2) the search warrant established probable cause, even without any information based on the warrantless entry, and (3) Count Four is not required to be severed, including because jury instructions can cure any alleged prejudice that may arise from disclosing Hill's status as a convicted felon.  (Hill's Objections to the R&R [145] 1-2.)

## II.    DISCUSSION

### A.    Legal Standard

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982), cert. denied, 459 U.S. 1112 (1983).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to

which objection is made." 28 U.S.C. § 636(b)(1). This requires that the district

judge "give fresh consideration to those issues to which specific objection has been

made by a party." Jeffrey S. v. State Bd. of Educ. of Ga., 896 F.2d 507, 512 (11th

Cir. 1990) (internal quotation marks omitted). With respect to those findings and

recommendations to which objections have not been asserted, the Court must

conduct a plain error review of the record. United States v. Slay, 714 F.2d 1093,

1095 (11th Cir. 1983), cert. denied, 464 U.S. 1050 (1984).

B.    Analysis

1.    *The Search of Room 314*

When law enforcement makes an initial warrantless entry into a location and

later obtains a search warrant, the government bears the burden to establish, by a

preponderance of the evidence, that the search warrant was obtained based upon

information independent of the warrantless entry. Nix v. Williams, 467 U.S. 431,

444 & n.5 (1984) ("If the prosecution can establish by a preponderance of the

evidence that the information ultimately or inevitably would have been discovered

by lawful means . . . the evidence should be received."); United States v. Jones,

433 Fed. Appx. 825, 828 (11th Cir. July 11, 2011) (holding that "'if the search

warrant was obtained based upon information from an independent source, then the

warrantless entry, even though illegal, [does] not require exclusion of [the]

12

evidence.'") (quoting United States v. Glinton, 154 F.3d 1245, 1254 (11th Cir.

1998)); United States v. Davis, 313 F.3d 1300, 1303 (11th Cir. 2002) (holding that

under the independent source doctrine, even where a Fourth Amendment violation

has occurred, evidence "obtained from a lawful source, independent of the illegal

conduct" is admissible).  It is well-established:

> When the affidavit for the search warrant contains information
> obtained as a result of the initial warrantless entry, "we . . . look to
> whether the other information provided in the affidavit is sufficient to
> support a probable cause finding." United States v. Chaves, 169 F.3d
> 687, 692 (11th Cir. 1999). . . . "If so, suppression is not required . . .
> provided . . . that 'the agents' decision to seek the warrant was not
> prompted by what they had seen during the initial entry.'" Chaves,
> 169 F.3d at 692-93 (quoting Murray [v. United States, 487 U.S. 533,
> 542 (1988)]).

Jones, 433 Fed. Appx. at 828.  In determining whether probable cause is

established in a warrant sought after warrantless entry, the Court first considers the

affidavit information, disregarding any information obtained from the warrantless

entry, to determine if there was sufficient probable cause to issue the warrant.

Second, the Court determines whether the decision to seek the warrant was

prompted by the assumed illegal entry.  See United States v. Noriega, 676 F.3d

1252, 1260 (11th Cir. 2012).

A reviewing court is not required to conduct a *de novo* determination of

probable cause, but only to determine whether there is substantial evidence in the

record to support a magistrate judge's decision to issue the warrant.  Massachusetts v. Upton, 466 (U.S. 727-728 (1984).  "We accord great deference to judicial determination of probable cause to issue a search warrant."  United States v. Robinson, 62 F.3d 1325, 1331 (11th Cir. 1995) (citing United States v. Gonzalez, 940 F.2d 1413, 1419 (11th Cir. 1991)).  Courts reviewing search warrants should not interpret supporting affidavits in a hypertechnical manner, but instead employ a realistic and commonsense approach to encourage engagement of the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations.  Illinois v. Gates, 462 U.S. 213, 236-37 (1983) (citing United States v. Ventresca, 380 U.S. 102, 109 (1965)); see also United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994).  "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."  Upton, 466 U.S. at 734.

Probable cause is based upon the evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer."  Ornelas v. United States, 517 U.S. 690, 696 (1996).  That is, probable cause is determined by courts on an objective basis without regard to the subjective belief of law enforcement officers.  See, e.g. Whren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis"); United

States v. Roy, 869 F.2d 1427, 1433 (11th Cir. 1989) (rejecting that probable cause turns on what a law enforcement officer may think and holding that "[c]ourts determine the existence of probable cause").

It is the totality of the circumstances that determines whether probable cause exists to support a search warrant, and the question is whether there is a fair probability that contraband or evidence will be found at a particular location. See Noriega, 676 F.3d at 1261; Gonzalez, 940 F.2d at 1419. "[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Gates, 462 U.S. at 241 (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). When issuing a warrant, a magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 232.

Considering only the information provided by the minor girls that was contained in the affidavit executed to support the search warrant application at issue here, and disregarding any information gleaned from the warrantless entry, there is a substantial factual basis that contraband evidence would be found in

15

room 314.  The information provided by the minor girls alone, before entry,

supported there was evidence that minors were made to perform illegal sex acts in

room 314, and there was reliable objective evidence provided by the young girls

that a gun was hidden behind the microwave in the room.  See United States v.

Hyde, 574 F.2d 856, 863 (5th Cir. 1978); United States v. Ridolf, 76 F. Supp. 2d

1305, 1308 (M.D. Ala. 1999).

Second, the information provided by the girls was based on their first-hand

knowledge, and was sufficiently detailed.  Although they at first misrepresented

their identities and ages, they subsequently provided their real names and they

acknowledged they were runaways from a juvenile center—information that was

corroborated by police.  The girls admitted they were participants in the conduct

that they described including engaging in prostitution and sex acts with adult

males.  They described a conversation between two of the men about a debt, that

condoms were used during sex acts, that the room had not been cleaned, and they

identified, specifically, the place where a firearm could be found.  Room 314 was

the room from which the girls initially exited when they first encountered Officer

Harder and was identified by the girls as the room where they engaged in the sex

acts described, where the use of condoms occurred, where the firearm behind the

microwave was present, and they described that it had not been cleaned.  The

affidavit, when read as a coherent whole, describes events that occurred and evidence observed in room 314.[10]

The information was also given to the police while the girls were in the back of a police car, guarded by at least one police officer, and safe from those whose control they had been removed.  It is reasonable, if not inevitable, to conclude that the girls realized that their ordeal would be at an end as a result of the truthful disclosure of what happened in room 314.  These circumstances support the reliability of their statements.  United States v. Foree, 43 F.3d 1572, 1576 (11th Cir. 1995) (holding that a tip is corroborated when given in "circumstances under which [the informant] is unlikely to lie" because a falsehood "would likely be discovered in short order and favors falsely curried would dissipate rapidly").  The Court necessarily concludes that independent of any observations that may have been made during the warrantless entry, the search warrant was supported by, and issued upon, a showing of probable cause.

To determine whether the decision to seek a warrant was prompted by observations made during a warrantless initial entry, a court evaluates whether the officers would have sought the warrant even if they had not entered.  Murray, 487

---

[10] Even if the magistrate had to imply that the events and evidence described were in room 314, doing so was a commonsense reading of the affidavit.  See United States v. Segura-Baltazar, 448 F.3d 1281, 1291 (11th Cir. 2006).

U.S. at 542 n.3; Noriega, 676 F.3d at 1252. If they would have, the decision to seek the warrant is supported by an "independent source" and the evidence seized under the warrant is admissible regardless of whether the initial entry violated the Fourth Amendment. Noriega, 676 F.3d at 1252.

In this case, the testimony and experience of the detectives provide a substantial basis of sufficient evidence to conclude that the nature of the crime under investigation would require the collection of physical evidence and that the detectives were preparing to seek a warrant prior to the warrantless entry. The identification of the evidence available in room 314 was well-supported by information and statements provided by the minor girls. Detective Largent testified that she asked the girls questions about specific items in the room to formulate information necessary to obtain a search warrant—something she had done in the past. (Id. at 26.)[11] She listed the evidence needed to support a warrant, and before the entry occurred, "we kind of all met together to talk about what evidence might be in the room, what things we need to articulate in the search warrant." (Id. at 28.)

Detective Drew stated that observation of the weapon did not impact the

_____

[11] Detective Largent had previously been involved in eight to ten child exploitation cases, of which at least one involved a search warrant. (Tr. of Magistrate Proceedings [112] 21.)

18

decision to seek a warrant because their focus was on the investigating of child exploitation.  (Tr. of Magistrate Proceedings [99] 48-49.)  The detectives listed the items that they needed to obtain during a search, such as physical evidence of condoms, bedding, and bodily fluid samples, and this was the basis on which the warrant was sought.  The Court finds this testimony credible.  The facts are simply that before even entering the room, these experienced investigators knew what evidence was there and knew that information was sufficient to seek a warrant. The government has established that the officers would have sought a search warrant even if they had not made the initial warrantless entry.  That is, the Court concludes that the officers were not motivated or prompted by observations during the warrantless entry to seek the search warrant.

Having concluded its *de novo* review, the Court concludes, even if the initial warrantless entry was unlawful, that probable cause existed to support the issuance of the search warrant, and that the officers were not prompted to obtain the search warrant by the warrantless entry.  The Court finds that the search warrant was validly issued and the motions to suppress are denied.[12]

---

[12] It is not necessary to address whether the search was lawful as a protective sweep or as triggered by exigent circumstances, whether the inevitable discovery doctrine applies, or whether the good-faith exception to the exclusionary rule applies.

2.      *The Motion to Sever Count Four*

The Magistrate Judge conducted the two-step analysis required to determine whether charges should be severed here, specifically, whether the firearm violation charged against Hill (Count Four) can be tried at the same time as the sex-trafficking charges alleged in the indictment.  The two steps are: (i) whether the initial joinder of charges was proper, and (ii) whether compelling prejudice results from the joinder.  United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002); United States v. Walser, 3 F.3d 380, 386-87 (11th Cir. 1993).  In applying the first step, the Magistrate Judge determined, under Rule 8(a) of the Federal Rules of Criminal Procedure, that the initial joinder of charges was proper because the firearm was used in the commission of the offenses involving A.C. and O.M. (R&R at 30-31.)  The parties do not object to this finding and this Court finds no plain error in it.  See United States v. Williams, 177 Fed. Appx. 914, 924 (11th Cir. Apr. 24, 2006) (firearm charge properly joined with drug charges because it was based on the same act or transaction of drug charges, since one of the weapons was found in the same place as the drugs).

The Magistrate Judge then conducted the second step of the analysis and determined that, under Rule 14(a), there are mechanisms to alleviate prejudice against Hill and that discretionary severance is thus not necessary.  (R&R at 33.)

Defendant Hill objects to this recommendation, arguing that allowing the jury to hear that Hill is a convicted felon will unfairly prejudice him because it adversely impacts his credibility. (Hill's Objections to the R&R [145] 17-19).

Even if properly joined, charges may be severed if that joinder will cause compelling prejudice against which the district court cannot offer protection. Walser, 3 F.3d at 386-87. Showing compelling prejudice is "a heavy burden, and one which mere conclusory allegations cannot carry." Id. at 386 (quoting United States v. Hogan, 986 F.2d 1364, 1375 (11th Cir. 1993)). "The test for assessing compelling prejudice is whether under all the circumstances of a particular case it is within the capacity of the jurors to follow a court's limiting instructions and appraise the independent evidence against a defendant solely on that defendant's own . . . conduct in relation to the allegations contained in the indictment and render a fair and impartial verdict." Hersh, 297 F. 3d at 1241.

Hill argues that no limiting instruction can cure the prejudice of his felony status. The Court disagrees. There are various mechanisms to address the prejudice Hill claims, including by the parties stipulating to Hill's felony status. See United States v. Albertie, 382 Fed. Appx. 876, 879-80 (11th Cir. June 14, 2010) (recognizing that when a defendant stipulates his status as a felon, evidence concerning the nature of the prior felony offense is then improperly admitted

because of the risk of unfair prejudice). The jury also may be instructed to consider the evidence for each count and against each defendant separately, and specifically evaluate the sex trafficking charges separate from the felon in possession charge. It is presumed that a jury follows the court's instructions and evaluates the evidence for each count independently. See United States v. York, 428 F.3d 1325, 1334 (11th Cir. 2005) (district court did not abuse its discretion where "the jury was expressly instructed that it was to consider each count of the Indictment separately and was further instructed that merely finding [the defendant] guilty of one charged offense was not to influence its verdict to the other charged offenses.").[13]

Having concluded its *de novo* review, the Court concludes that Hill has not shown that he will suffer compelling prejudice by the permitted joinder of Count Four with the other sex-trafficking counts and Hill's Motion to Sever Count Four is denied.

## III.   CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Magistrate Judge Alan J. Baverman's

---

[13] The government represented that it will not emphasize Hill's prior record and will simply provide that he has a previous felony conviction.

Final Report and Recommendation [137] is **ADOPTED**.

**IT IS FURTHER ORDERED** that Joshua Thomas Hill's motions to suppress evidence [46, 71, and 96] and to sever Count Four [48], and Fabian Terran Murray's motion to suppress evidence [80] is **DENIED**.

**IT IS FURTHER ORDERED** that, to the extent that Hill challenges the search of the cell phone as part of his motions to suppress evidence, that motion is **DENIED** because he did not establish standing to contest its seizure or search. Murray's motion to suppress identification [81] is **DENIED AS WITHDRAWN.**

**SO ORDERED** this 6th day of December, 2013.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE